**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

**THE UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **Case No. 1:18-CR-251**

**v.**

        **Hon. Robert J. Jonker**
        **Chief U.S. District Court Judge**

**RAYMOND DEMETRIUS STOVALL,**

        **Defendant.**

_____/

## DEFENDANT RAYMOND STOVALL'S MOTION TO SUPPRESS WIRETAP EVIDENCE AND MEMORANDUM IN SUPPORT

Now comes the Defendant Raymond Demetrius Stovall, by and through his counsel, and moves this Court to suppress certain evidence obtained through wiretaps of multiple phones and all evidence derived from that information and those wiretaps. This motion is filed pursuant to L. Crim. R. 47.1(a). In support of this motion, Mr. Stovall offers the following memorandum of law.

### *Procedural Background*

The government filed a criminal complaint on August 29, 2018. RE. 1 and 1-1: Complaint & Continuation of Complaint, PageID # 1-107. This complaint alleged a conspiracy to distribute controlled substances, and possession of controlled substances with the intent to distribute, citing a date range of 2017 through August 2018 and locations in Berrien and Kalamazoo Counties. RE. 1: Complaint, PageID # 1. The complaint cited the wiretaps at issue here in support of its allegations. *See* RE. 1-1: Continuation of Complaint, PageID # 3, 13 n.1. It cited eighteen alleged co-conspirators and eleven locations for which officers wanted to obtain search warrants. RE. 1-1: Continuation of Complaint, PageID # 5, 6-7.

Authorities arrested Mr. Stovall on August 30, 2018, and Mr. Stovall had his first appearance before the Court on that day. *See* RE. 36: Minutes of First Appearance, PageID # 172. On September

5, 2018, Mr. Stovall appeared before the Court and waived his preliminary and detention hearings; the Court ordered him detained. RE. 85: Minutes of Detention Hearing, PageID # 303. The government filed an indictment on November 14, 2018, naming Mr. Stovall and four co-defendants and charging various methamphetamine- and firearm-related offenses. RE. 194: Indictment, PageID # 226-43. On November 16, 2018, the government filed an information and notice regarding Mr. Stovall's prior drug convictions. RE. 198: Information and Notice, PageID # 256-58. Mr. Stovall's arraignment and initial pretrial conference are scheduled for November 26, 2018. *See* RE. 200: Notice of Arraignment, PageID # 261.

### Factual Discussion

In June 2017, Michigan State authorities initiated an investigation of Mr. Stovall. RE. 2-3: Application for Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 33.[1] Supposedly, a confidential informant alleged that Mr. Stovall participated in a meth-trafficking operation in the Kalamazoo and Benton Harbor areas. *See id.* at 29, 34. Allegedly, Mr. Stovall received drug shipments from a person named Kentrell Dunn in Arizona. *Id.*; *see also* RE. 1-1: Continuation of Complaint, PageID # 4. Authorities claimed Mr. Stovall had two prior state drug convictions from 2007 and a felon-in-possession conviction from 2013. RE. 2-3: Application for Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 29-30. Allegedly, the drug-trafficking organization maintained a "stash house" on Park Street in Kalamazoo, and authorities supposedly observed members of the alleged organization at this location. *See id.* at 31. When officers applied for wiretap authorization of what they called Target Phones 1 and 2, they had allegedly conducted nine controlled buys with Richard James, Jr. *See id.* at 33-34. Mr. James supposedly served as "second in command" for the alleged drug-trafficking organization. *See* RE. 1-1: Continuation of Complaint, PageID # 4.

---

[1] The wiretap-application materials have record-entry numbers from case number 1:18-MC-59.

The first confidential informant, on whom authorities relied to allege probable cause to support the wiretaps, did not operate reliably for the police. As the government conceded on July 2, 2018, when it filed its application for wiretaps of Target Phones 1 and 2, this informant presented a number of troubling behaviors. *See id.* at 34 n.1; *see also* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2448. In January 2018, police had allegedly involved a second confidential informant in the investigation. *See id.* at 36. This informant alleged they had purchased methamphetamine from Mr. Stovall. *Id.* Again, however, the government had to concede some untoward behavior by this informant (possession of unauthorized narcotics). *See id.* at 36 n.2. (The application for the extension of the wiretaps did not mention this drug possession. *See* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2448.) This second informant also had prior violent-felony and drug convictions. *Id.*

The application seeking authorization for wiretaps of Target Phones 1 and 2 states that officers met with a third confidential informant in December 2017. *Id.* at 37. This informant supposedly identified Mr. Stovall and Richard James in photographs. *Id.* The government acknowledges this third informant's criminal history and current criminal charges. *Id.* at 37 n.3; *see also* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2448.

On the day the government filed the application for the wiretaps, July 2, 2018, the Court approved the application. *See* RE. 3: Order Authorizing Interception of Communications on Target Phones 1 & 2, PageID # 94-105. It approved intercepting background conversations caught on the phone lines. *Id.* at 98. And it allowed for intercepting voicemails. *See id.* Initially, it gave authorities 30 days to intercept communications. *Id.* at 100. Leading up to this wiretap application, the government had sought authorization for pen-trap devices. RE. 2, 1:18-MC-26: Application for Pen-Traps, PageID # 2-17. The Court approved this order. RE. 3, 1:18-MC-26: Order Approving Pen-Traps, PageID # 22-25; RE. 4, 1:18-MC-26: Additional Order Approving Pen-Traps, PageID # 26-29. And the

government had obtained, on May 1, 2018, a warrant for cell-phone tracking and obtaining historical-location data. *See, e.g.*, RE. 1-1: Continuation of Complaint, PageID # 73.

On August 3, 2018, the government applied for an extension of the wiretaps of Target Phones 1 and 2. RE. 9: Application for Extension of Wiretaps of Phones 1 & 2, PageID # 2375-88. This application identified new target subjects. *See* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2404-06. The Court authorized the extension on August 3, 2018. RE. 10: Order Authorizing Continuation of Wiretaps, PageID # 2473-84.

Where the initial affidavit in support of the original wiretap application conceded improprieties with two confidential informants, the affidavit in support of the extension had to concede improprieties with an undercover detective, who had been engaging in the alleged controlled buys *and* had engaged in an intimate relationship with an arrestee (arrested in an unrelated matter). *See id.* at 2408 n.1.

The wiretaps continued through phone-number changes. *See* RE. 1-1: Continuation of Complaint, PageID # 63. Ultimately, the government filed the criminal complaint discussed above. Mr. Stovall is now in custody and seeks to suppress all evidence derived from the illegal wiretaps in this case.

### *Legal Discussion*

**The applications for the wiretaps in this case were deficient and the evidence derived under them should be suppressed. The applications and subsequent orders (based on the deficient applications) that authorized the wiretaps were insufficient on their faces, and the communications at issue were unlawfully intercepted.**

In drug investigations, the government may apply for judicial authorization to intercept wire and oral communications. 18 U.S.C. § 2516(1)(e). Section 2518 lays out the procedure for the government to obtain authorization for such wiretapping. *See* 18 U.S.C. § 2518(1). The government must provide, among other things, a statement regarding the necessity of the wiretap, of why "other

investigative procedures" have failed or would not succeed if tried or would be too dangerous. *See* 18 U.S.C. § 2518(1)(c).

Thus, to issue the authorization, a judge must find probable cause to believe that an individual is committing an offense, that the interception will produce communications about that offense, that normal investigative procedures will not succeed, and (in some circumstances) that the facilities involved are being used in connection with the offense. 18 U.S.C. § 2518(3). If the target of an interception (or any "aggrieved person") believes an interception was unlawful, they may move the court to suppress the interception and evidence derived from it. 18 U.S.C. § 2518(10). The government recognizes Mr. Stovall as a target. *See* RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 23, 26, 29. He is an appropriate person to challenge these wiretaps.

Among the arguments an aggrieved person may raise are that the communications at issue were unlawfully intercepted and that the order authorizing the interception was insufficient on its face. 18 U.S.C. § 2518(10)(a)(ii) & (ii); *see also United States v. Gray*, 372 F. Supp. 2d 1025, 1035 n.5 (N.D. Ohio 2005) (discussing parallel interpretation of these two prongs of the suppression analysis in a case involving a challenge based on the insufficient identification of the authorizer of an application). Courts may not admit into evidence any communications from wiretaps, or evidence derived from such communications or wiretaps, obtained in violation of the statutory requirements. 18 U.S.C. § 2515; *see also United States v. Giordano*, 416 U.S. 505, 508 (1974).

In considering such challenges, courts generally cannot go beyond "the information that the United States submitted to the judge who issued the wiretap order." *See United States v. Roybal*, 46 F. Supp. 3d 1127, 1149 (D.N.M. 2014). Four-corners review thus varies a bit in this context. *Id.* An issuing judge may require that the government produce additional testimonial or documentary evidence in support of a wiretap application. So "the information before the issuing judge includes the Applications, Affidavits and Orders authorizing the wiretaps and also the 'testimonial or

documentary evidence' introduced at the *in camera* proceedings before the issuing judge." *Id.* at 1149-50. The defense may obtain all these materials in the context of seeking suppression of wiretap evidence. *See id.* at 1168; *see also id.* at 1169 n.7 (suggesting the breadth of discovery in this context may include wiretap progress reports in some circumstances, including situations in which the government sought an extension to a wiretap). Mr. Stovall currently has the applications the government filed in this matter. If additional testimonial or documentary evidence related to the applications exists, Mr. Stovall asks the Court to order its disclosure, so Mr. Stovall can address such evidence in this suppression context.

The materials available in this case demonstrate that the government has simply failed to show the necessity of engaging in the serious intrusion into privacy involved in wiretapping. The initial application's deficiencies spill over to the later application for the extensions of the wiretaps. *See* 18 U.S.C. § 2518(10)(a) (allowing for suppression of derivative evidence); *see also Giordano*, 416 U.S. at 533. Regardless of the affidavits' length in this case, the government has come up short here. The Sixth Circuit has consistently emphasized that length does not make an affidavit valid. *See, e.g.*, *United States v. Helton*, 314 F.3d 812, 816, 825 (6ᵗʰ Cir. 2003) (court found lack of probable cause to support the search warrant, despite the affidavit spanning 27 pages and 64 paragraphs). The government cannot satisfy the necessity requirement, and the irregularities surrounding the informants, an agent, and a postal worker in this case undercut any potential finding of probable cause.

    a.    **The applications (initial and extension) for the wiretaps in this case failed to establish that authorities had tried normal investigative procedures and that these procedures had failed or that such procedures reasonably appeared unlikely to succeed or that such procedures would be too dangerous. The applications thus failed to establish the** necessity **of the wiretaps and resulted in insufficient orders and unlawful interceptions.**

The "necessity requirement," the requirement that the application contain a statement regarding the use of "normal" investigative procedures and why such procedures will not work in the case, aims at ensuring that authorities do not resort to wiretaps in situations where traditional

investigative techniques would suffice to expose an offense. *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007). It protects against the impermissible use of wiretaps as first steps in investigations. *Id.* The statutory requirements simply ask investigators to "give serious consideration" to non-wiretap techniques before they apply for wiretap authority. *Id.* The requirements ask authorities to inform courts of the reasons for the investigators' beliefs that non-wiretap techniques have not or will not succeed. *Id.* While an officer's prior experience may be relevant in analyzing whether other investigative procedures are likely to succeed if tried, "a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand" will not suffice to comply with the statute. *Id.*

Because the necessity requirement sits as a statutory requirement to obtain wiretapping authorization, "and because suppression is the appropriate remedy for a violation under Title III," when "a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must be suppressed." *Id.* Mr. Stovall's case merits such suppression, and the Sixth Circuit's decision in *Rice* provides support for this conclusion.

In *Rice*, the court boiled the matter down to the wiretap application containing assertions that the confidential informant had been unable to make contact with the defendant and was thus of no use; "that pen registers and telephone tolls revealed possible connections to other people with histories of drug-related arrests"; and "generalized and uncorroborated information about why grand jury subpoenas, witness interviewing and search warrants, and trash pulls would not be useful." *Id.* at 711. The court affirmed the district court's suppression of the evidence derived from the wiretap. *Id.*

The same deficiencies appear in Mr. Stovall's case. While *Rice* involved misleading statements, the Sixth Circuit upheld suppression for multiple reasons—not simply based on the misleading statements. *See id.* at 707 & 710-11 (misleading statements), 708 & 711 (other problems with averments). For example, the *Rice* court discussed the district court's finding that the pen-register

7

section of the affidavit focused on "general language" regarding the usefulness of pen registers. *Id.* at 708. The only case-specific information related to a statement that "within the limitations of the technology, the pen register has been as useful as it possibly can be—linking [the defendant] with other individuals with known drug histories." *Id.* The affidavit lacked specifics as to the calls traced. *Id.*

The statements in the *Rice* affidavit connected to search warrants amounted to generic assertions. *See id.* The district court in *Rice* had found that the explanations the authorities offered for not attempting these techniques all suffered from the same problem: They involved *typical problems* with the techniques in *typical drug cases*, but failed to refer to any facts specifically about the defendant. *Id.* While the district court, and the later-reviewing Sixth Circuit, mentioned the credibility issues related to the affidavit, the generic nature of the assertions led the discussion on the point. *See id.* at 708, 711. The *Rice* court made this point clear: "After reviewing the record, we find that the district court was not in error in concluding that what was left of the Wenther Affidavit did not provide 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Id.* at 711. On these grounds, the court affirmed "the district court's decision to suppress the fruits of the wiretap." *Id.* The *Rice* decision thus carries significant weight in Mr. Stovall's matter.

In applying for authorization to tap Target Phones 1 and 2 in Mr. Stovall's case, authorities conjectured that the wiretaps would reveal the nature, extent, and methods of the alleged subject drug distribution; the nature of the target subjects' alleged illegal business transactions; the identities of accomplices; the distribution and transfer of drugs and money; the location of supposed records related to the alleged illegal transactions; the location and source of financing for the alleged illegal activities; the disposition of any illegal proceeds; and the locations and items used to further any illegal activities. RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 27. In its application

for the wiretaps, citing § 2703, the government also asked for an order requiring a phone-service provider to release certain records related to the target phones. *See* RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 90-91. The government requested installation of trap-and-trace and pen-register devices, citing §§ 3122 through 3124. RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 89-90.

The government's discussion of necessity begins with setting out the investigation's aims. RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 62. In its exposition, the government itself actually raises several points that militate in favor of suppressing the evidence at issue. For example, in discounting the potential use of confidential informants, the government cites the first informant's rogue conduct. *See* RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 71; RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2448. The initial application acknowledges the unreliable actions of the second informant and that person's possession of unauthorized narcotics. *See* RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 36 n.2.

Regarding the third informant, the government points to pending state prosecution. *Id.* at 72; RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2448. Given the cooperative nature of state and federal law enforcement, however, it seems likely that that federal authorities in this case could have worked with the state to secure continued cooperation from the third informant. The applicant for the wiretaps also alluded to general difficulties in securing information and resources. *Id.* Given the disorganized and unreliable nature of the use of informants demonstrated in the affidavits here, the government cannot demonstrate necessity—it should have obtained reliable informants, used them in the investigation, and *then* assessed the necessity of further tactics like wiretaps.

The initial application's disclaiming of the potential utility of target-subject interviews revolves around general difficulties with such interviews. *Id.* at 74-75. The discussion devolves into boilerplate and does not involve case-specific claims of difficulty (beyond a broad statement that the alleged drug organization supposedly involved associations with people who would likely be loyal to the alleged organization). *See id.* at 75. The application fails to allege unsuccessful or fruitless attempts at interviews. *See id.* The affiant specifically cites *experience*, rather than case circumstances, to explain the supposed necessity for wiretaps. *See id.* at 74-75. This reliance on general experience arises in the discussion of trap-and-trace, pen-register records later as well. *See id.* at 78.

The same can be said of the application's treatment of potential grand-jury subpoenas. *See id.* at 75-76. The application discounts the value of historical call data: "subpoenas for historical call contact between the TARGET SUBJECTS would provide only limited, and in the case of some service providers, no information about electronic text contact between the targets of the investigation." *Id.* at 76. Conclusory statements like this one fail to establish investigative *necessity*. They demonstrate that authorities did not even try to pursue these available avenues, did not know conclusively what such investigation would produce. In discounting searches, the application ignores its own identification of supposed "stash houses" and the usual assertions in warrant affidavits that such houses may contain records of drug-trafficking operations and drug-trafficking proceeds. *See id.* at 76-77.

In the context of disclaiming the potential utility of search warrants, the wiretap application for Target Phones 1 and 2 makes a telling concession. The application suggests that authorities felt they lacked sufficient probable cause to obtain search warrants, despite repeated references to alleged "stash houses." *See id.* at 77. Regarding mail covers, the government again faced problems with its own personnel. Where the two confidential informants and the undercover detective proved unreliable and were cited as such in the initial affidavit (informants) and the affidavit in support of the extension

(undercover detective), the government stated it could not conduct a mail cover because of an investigation into a post-office employee intercepting packages intended for the alleged drug-trafficking organization, an investigation the authorities did not want to jeopardize or interrupt. *See id.* at 82-83.

Regarding the application to extend the wiretaps of Target Phones 1 and 2, the affiant included excerpts of conversations supposedly intercepted during the initial wiretaps, and with these conversations, the affiant offered "explanations" to "clarify" the supposed meanings of certain exchanges. *See, e.g.*, RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2425-26. The problem with these "interpretations" is that they involve common-sense, non-specialized readings. For example, the affiant states: "When STOVALL said, 'I'll probably take off Monday or Tuesday,' STOVALL was indicating that he was going to leave for Arizona on Monday or Tuesday." *Id.* at 2426. Any English speaker could reach this conclusion.

The affiant goes on to state: "When FARMER then said, 'I'll show you a better way to do that shit bro, so it takes some of that pressure off y'all,' he was suggesting to STOVALL that he could tell him how to send the drug proceeds to DUNN without having to fly out to Arizona." *Id.* The affiant provides no support for his interpretation of the exchange, no reasoning behind his conclusions on meaning here. The affiant refers to his "knowledge of the investigation" as a tool in making these interpretations, but he offers no sense of that knowledge, of the things held back from the affidavit that would help him analyze the phone and text exchanges. *See, e.g.*, *id.* at 2427. This withholding presents troubling issues and undercuts a finding of probable cause based on the four corners of the affidavit and the other materials available for review in this case. *See Roybal*, 46 F. Supp. at 1149-50. The affiant is asking the reader to simply trust he has undisclosed, revelatory knowledge. If the government presented additional materials to the Court to provide evidence of facts not included in

the application for the extension of the wiretap, Mr. Stovall has a right to review these materials and requests an opportunity to do so. *See id.* at 1169 & n.7.

If the affiant presented no additional material, the conclusory statements in the application for the extension fail to support a finding of probable cause to extend the wiretaps. These instances of unsupported assertions about the alleged meanings of exchanges abound in the extension application and undercut any possible probable cause. *See, e.g.*, RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2428 ("interpreting" Mr. Stovall's inquiry regarding visiting someone's home); PageID # 2429 (an exchange about meeting at a breakfast eatery). Some assertions are difficult to take seriously. For example, the affiant "explains" that Robert Armstrong saying he had been "'fucking with' his phone" and going to the Boost Mobile Store meant Mr. Armstrong had been "having problems with his phone." *Id.* at 2432. And there is the citation of an exchange in which Mr. Stovall supposedly said, "I'm going to pull up right now bro" and the affiant "explains" that "STOVALL was telling ARMSTRONG that he was about to arrive at his residence." *Id.* at 2432.

Moving onward from this place of common-sense readings, the government concedes that reviewing officers misinterpreted some of the intercepted conversations. In the original criminal complaint, of August 29, 2018, the affiant addressed a specific intercepted exchange and acknowledged that "[t]his portion of this conversation was misinterpreted in the affidavit in support of the second application for Title III interceptions." RE. 11: Continuation of Complaint, PageID # 31 n. 10.

The extension application goes on to present insufficiencies similar to those in the original application. Regarding the efficacy of witness interviews and grand-jury subpoenas, the extension application falls back on general statements about the potential issues raised by such investigative techniques. *See, e.g.* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C

(Affidavit), PageID # 2451-53. The same problems hold for the extension application's discussion of searches. *See* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2453.

The extension application's discussion of trash pulls offers nothing but generic excuses for foregoing this investigative avenue. *See* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2456. The language is virtually identical to the language in the original application. *Cf.* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2456; RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 79-80. This copying of the earlier language indicates authorities did not seriously consider this, and indeed other, potential investigative avenues here—they simply discounted these avenues as they had earlier. Underscoring this point is the reuse of the earlier application language in the sections discounting mobile tracking devices and video surveillance cameras. *Cf.* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2456-58 (tracking), 2458-59 (surveillance cameras); RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 80-81 (tracking), 82 (surveillance cameras).

This reuse of language, and the concomitant lack of sincerity in considering alternative investigative methods it indicates, brings disconcerting issues into relief in the extension application's section on mail covers. That section uses the exact same language as the original application. *Cf.* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2459-60; RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 82-83. It offers no updates on the investigation of the mail carrier allegedly intercepting packages for the supposed drug-trafficking organization. *See* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2459. It strains credulity to think that no progress was made on the postal investigation in the thirty days between the initial wiretap application and the application for an

extension. It seems reasonable to expect that the U.S Postal Service would have taken strides of some sort to address the issue and thus possibly make mail covers a useful investigative technique.

The Court seems to have recognized some of the shortcomings of the extension application. The Court crossed out suspect names in the probable-cause section, indicating it did *not* believe probable cause existed to believe those people were committing target offenses. *See* RE. 10: Order Authorizing Continuation of Wiretaps, PageID # 2476.

As the Sixth Circuit has admonished, the government and issuing courts should use the statutory authority granted for wiretapping "with restraint" and only when circumstances warrant such surreptitious interception. *See United States v. Gray*, 521 F.3d 514, 521 (6th Cir. 2008). The Circuit has clarified that one may challenge a wiretap for not just constitutional violations but also for violations of the statutory authority. *Id.* at 522. In delineating the statutory violations warranting suppression, the Circuit has said that technical defects may not require suppression, but investigators, prosecutors, and courts must honor the statutory protections required, such as that requiring that "[t]he mature judgment of a particular, responsible Department of Justice official [be] interposed as a critical precondition to any judicial order." *See id.* at 522, 524. In considering a challenge to a wiretap application, courts will consider whether Title III's "essential safeguards" have been undermined. *See id.* at 527. As in *Rice*, the affidavits in support of the wiretaps in Mr. Stovall's case fail to honor the essential statutory safeguards.

While district courts wrestling with these issues must apply the varied rules of their circuits, one can see general trends and themes in their decisions. In *United States v. Ailemen*, 986 F. Supp. 1228, 1244 (N.D. Cal. 1997), the magistrate judge recommended suppression of the challenged wiretap evidence. The judge felt that the government had failed to make the required "good faith effort" to generate the evidence it sought through "normal investigative techniques." *Id.* at 1245. Relative to the alleged magnitude of the case and the alleged high priority of the investigation to the government, the

government had failed to devote "reasonable resources over a reasonable period of time to normal investigative methods." *Id.*

The *Ailemen* court recognized that wiretaps threaten "core values in our society." *Id.* at 1246. That court pointed out the government had devoted "less than two months of serious undercover and surveillance work to this investigation before it decided to shift the investigatorial center of gravity to the wiretap." *Id.* at 1247. The government failed to pursue "many potentially significant investigatory leads that it had developed, or with reasonable competence should have developed," before seeking the wiretap, and it failed to develop the promising leads it had. *Id.* Some of those "leads clearly would have yielded valuable information about the sources of the drugs" at issue, and "the decision to rely on the wiretap as the principal investigatory tool was made no later than the first week in March of 1993," which was almost five months before authorities submitted the application. *Id.* After that point, "the only investigatory efforts of any consequence were directed toward analysis of telephone communications." *Id.*

In a related vein, the affidavit obscured many of these shortcomings, making implications regarding the extent of the investigation. *Id.* While the timing of the investigation in Mr. Stovall's case diverged from that in *Ailemen*, *Ailemen*, involved "traditional" investigatory methods that may have produced information on multiple additional participants in the alleged trafficking. *See id.* at 1275 (pointing out that traditional investigation had turned up seven additional participants). The same may have been present in Mr. Stovall's case. In the initial application for the wiretaps, the affiant identified something like sixteen alleged participants by name—participants who had come to the attention of law enforcement through traditional investigative means. *See* RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 26.

In the case at hand, as in *Ailemen*, the government failed to pursue viable traditional investigation. *See Ailemen*, 986 F. Supp. at 1276. The government concedes that investigators did not

pursue avenues such as interviewing suspects, searches with warrants (despite plans for such searches once the government brought charges), and trash pulls. RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 74-76, 76-77, 79-80. The discussion of using search warrants *later* flies in the face of the statutory requirements for wiretaps: Turning to tools like search warrants *after* applying for wiretap authorization represents exactly the approach condemned in 18 U.S.C. § 2518(1)(c). Section 2518 requires that "other investigative procedures have been tried" (and failed) or that other techniques "reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Given their plan to use search warrants, and the alleged probable cause they implied they had to support such warrants, the authorities here should have executed search warrants *before* resorting to wiretaps. *Cf.* RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 77.

Many of the averments in each of the affidavits involve "ritualistically repeating" strains of or themes from statutory language (e.g., language about the potential risks of pursuing "traditional" investigatory methods). *See Ailemen*, 986 F. Supp. at 1285. For example, the affiant simply asserted that trash pulls "run the risk of compromising the investigation if detected" and "contacting the garbage service responsible for trash pickup at target addresses would risk alerting others that law enforcement is targeting individuals who live at or are connected to a given location." *See, e.g.*, RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 80. These assertions do not fulfill the statutory requirement, which implies specificity, and they do not ring true given the use of such "traditional" techniques in a wide array of cases and investigations. *See Ailemen*, 986 F. Supp. at 1286. Courts have charged the government "with knowing that this kind of merely generic knowledge is not sufficient to support a finding of necessity." *Id.* at 1285-86.

In discussing investigatory leads in a related Canadian case in *Ailemen*, the court pointed out that information from that related investigation "virtually compelled" the conclusion that the defendant was involved in heroin purchasing and in smuggling. *Id.* at 1314. In *Ailemen*, the court

concluded that information like this information, learned through "traditional" investigation, obviated the *need* for the wiretap. *Id.* The same can be said of Mr. Stovall's case: The affidavit alleged information and potential leads that did away with any possible finding that a wiretap was *necessary*. Given all the wiretap applications' deficiencies discussed here, the evidence derived from these taps should be suppressed. In the alternative, the evidence derived from the extension should be suppressed—the extension application demonstrates an even greater lack of necessity than the initial application.

> **b.** **The problems with the government's sources in this case undermine a finding of probable cause to support the wiretaps here.**

Under § 2518(3)(a) and (b), beyond necessity, an application for a wiretap must demonstrate probable cause to believe that an individual is committing a qualifying offense (namely, a drug offense under § 2516(1)(e)) and that the wiretap will reveal information concerning that offense. In this case, the serious issues raised by the unreliability of the government's informants and agents undercut the believability of the applications' assertions and, ultimately, any possible findings of probable cause.

As discussed above, the affidavits here present factors that undermine potential probable-cause findings and militate in favor of suppressing the evidence at issue. Mr. Stovall asks the Court to consider his earlier arguments on necessity in the context of this probable-cause analysis as well. The deficiencies demonstrated in the preceding section underscore the lack of probable cause in the wiretap applications here.

Regarding, the government's sources of information, they presented serious problems that undermine a probable-cause finding. The first informant engaged in rogue conduct. *See* RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 71; RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2448. The third informant faced pending state prosecution. RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 72; RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2448. The affidavit in support of the extension conceded an undercover detective had been engaging

in alleged controlled buys *and* an intimate relationship with an arrestee (arrested in an unrelated matter). *See* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2408 n.1.

The government allegedly could not conduct a mail cover because of an investigation into a post-office employee intercepting packages intended for the alleged drug-trafficking organization. *See* RE. 2-3: Application for Wiretap of Phones 1 & 2, Exhibit C, PageID # 82-83. The second confidential informant in the investigation engaged in unauthorized possession of narcotics. *See id.* at 36 n.2. While the application for the extension of the wiretaps did not mention this drug possession, it did recognize that informant's prior violent-felony and drug convictions. *See* RE. 9-3: Application for Extension of Wiretaps of Phones 1 & 2, Exhibit C (Affidavit), PageID # 2448.

The magistrate judge in *United States v. Fuentes*, N. 9-CR-00143-RJA-JJM, 2012 U.S. Dist. LEXIS 144043 (W.D.N.Y. Apr. 25, 2012), recommended denying a wiretap suppression motion when the defense presented *no* evidence of informant unreliability. That case provides a foil to demonstrate the merits of Mr. Stovall's arguments. In *Fuentes*, unlike in Mr. Stovall's case, the defense's "only challenge to the probable cause supporting the wiretap warrants" rested upon "information and belief" that the confidential informants "used in the application were inherently unreliable and suspect." *Fuentes*, 2012 U.S. Dist. LEXIS 144043, at *13.

Mr. Stovall, on the other hand, has pointed out specific instances of informants and government agents behaving unreliably and contrary to law. Indeed, even the government has recognized the complications and unreliability inherent in these people's behaviors. A confidential informant's trustworthiness "lies at the heart of the reliability determination." *United State v. Lull*, 824 F.3d 109, 117 (4th Cir. 2016). Here the inquiry takes on even greater significance because the case involves *two* unreliable confidential informants, an unreliable undercover agent, and an unreliable

postal system and worker. Information related to any of these sources bears the taint of these sources' illegalities and unreliable natures and should be suppressed.

### c.   No good-faith exception exists in this context to save the communications and derived evidence at issue from suppression.

Courts have considered, and rejected, the idea of a good-faith exception in the wiretap arena. No good-faith exception exists in this context to save the challenged evidence here. *See Rice*, 478 F.3d at 711.

In cases such as this one—cases in which the government has engaged in extensive investigation, invested massive quantities of resources and thousands of hours—it bears returning to certain fundamentals. As Justice Brandeis reminded the nation in his dissent in *Olmstead v. United States*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting), one of the Supreme Court's fundamental wiretapping cases, "[e]xperience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent." People "born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers," but "[t]he greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Id.* The statutory scheme governing wiretapping simply asks investigators to use "traditional" investigatory tools and resort to wiretapping only when truly necessary. This approach honors this country's tradition that "it is better that a few criminals escape than that the privacies of life of all the people be exposed to the agents of the government, who will act at their own discretion, the honest and the dishonest, unauthorized and unrestrained by the courts." *See id.* at 479 n.12 (Brandeis, J., dissenting).

### Conclusion

For these reasons, Mr. Stovall asks the Court to suppress all evidence derived from the wiretaps in this case. Such evidence includes all evidence derived from the execution of the search warrants in this case. The affidavits in support of those search warrants relied on information derived from these contested wiretaps. *See, e.g.*, RE. 1-1: Continuation of Complaint, PageID # 78-80, 82, 83-

84, 85-87, 87-88 & ¶ 198 (citing earlier paragraphs that detailed ties to the wiretap evidence), 89, 92-95, 96, 98-99, 101, 104-05. If the Court finds sufficient bases to uphold the initial wiretaps, Mr. Stovall asks the Court to at least suppress the additional wiretaps conducted under the extension as unnecessary.

Date:  November 21, 2018                **SCOTT GRAHAM PLLC**

                                         By: /s/ Scott Graham
                                              SCOTT GRAHAM
                                              Attorney for Defendant
                                         Business Address:
                                              1911 West Centre Avenue, Suite C
                                              Portage, Michigan 49024-5399
                                              sgraham@scottgrahampllc.com